Good morning, Your Honors. My name is Mark Mikulski. I am counsel for Hayward Industries in this matter. And again, Your Honors, this is another appeal from an inter-parties re-examination proceeding in the USPTO. Your Honors, in this appeal, we believe that the Board committed several errors that require this Court's reversal. And specifically, I think there are three major issues that we should discuss with you today. The first is with respect to the adopted grounds of prior art rejection that were adopted by the examiner, but were incorrectly reversed by the Board. And that Board's decision is not supported by substantial evidence. Secondly, I would like to talk about the Section 112 issues. But before I get to that, the three references that I will be discussing with respect to prior art, Your Honors, are the Genheimer reference, the Baldor reference, and the Caro reference. The second issue, as I started to say, is the Section 112 grounds of rejection. I would like to talk about why the Board's reversal of those grounds are not supported by substantial evidence. And finally, I'd like to talk about other grounds that were raised in this appeal to the Board in an on-cross appeal, which are entirely not addressed whatsoever by the Board's opinion. I'd like to turn first to the prior art grounds. And in particular, I'd like to focus on the Genheimer grounds of rejection, which were adopted by the examiner with respect to Claims 1 through 7 and 9 through 14, and why the Board's reversal of those rejections was improper. First of all, Your Honors, there are three issues here. The first is with respect to the construction of the claim term drive. And that claim construction issue only impacts the Genheimer analysis. We believe that the Board improperly construed the term drive to require a variable speed drive. Okay. Let's suppose you're correct about that. Yes, Your Honors. But they also said it's not an on-off switch. And does Genheimer disclose anything other than an on-off switch? I believe it does, Your Honor. And in fact, the reference talks about electromagnetic circuitry that exists within that starter of 36. How is it not an on-off switch? My understanding of Genheimer is that it's an on-off switch in the sense that it'll turn it on and off. And the only difference from a traditional on-off switch is that if you have a power loss, that the system will revert to the off position so that when the power goes back on, it doesn't start the pump again. I think the difference there, Your Honor, is that there is a coil, and that coil is under microprocessor control. And the microprocessor selectively can turn the switch on and off, of course, but also maintain the application of power when it's necessary for the drive to run. So that is a function that has a temporal duration. So it's a form of a kind of relay? Correct, Your Honor. Well, that's, I mean, why isn't that just an electronic switch? Well, I think, Your Honors, that, you know, when the examiner's construction, which says the electronics that produce the proper electrical signal, it has to be evaluated from the perspective of the device that is being powered. The proper electrical signal would be, I need to have this power applied for a particular duration for the motor to be on. And that's why we believe that that's proper and why it's taught by this reference. But, Your Honors, I think also... The key for you in terms of the word proper is the timing. Intended purpose for the motor, and timing could be part of that. Absolutely not. I think regardless of what the construction issue is, whether the board, whether this court adopts the board's construction or the examiner's construction, the references, the Genheimer references teach that. The grounds of rejection that were adopted by the examiner teach that. So we've been talking about the Genheimer reference itself under the board's construction, under our construction. But under the board's construction, Your Honor, if this court is inclined to find that the term drive refers to something that's beyond just a switch, there was an adopted ground of rejection in its issue 20 that was presented to the examiner, and it specifically addressed the combination of the Genheimer reference, which the examiner agreed has everything that is taught in the claims at issue of the 587 patent, with the combination of the Carroll reference. The Carroll reference is a textbook that specifically is directed to variable frequency drives. And in fact, it discloses the inverter type of architecture that is at issue in the 587 patent. So that was never addressed by the board in its decision. The obviousness combination of those two references was never addressed at all. And we believe that that's sufficient for this court to look at the record, to see that the examiner agreed with us that that's an obvious combination, and I agree with you, and to uphold that the claims are obvious in view of that. I'd like to turn, Your Honors, if I could, to the Baldor grounds of rejection, and that's the second portion of my presentation on the prior part. And I think there are three issues here. The issue that has been pointed to by opposing counsel is with respect to what's referred to as the torque limit mode of operation. Now, let me step back with the Baldor reference and just describe what it teaches. Baldor teaches a variable frequency drive that has the ability to detect an overcurrent condition, to shut down the motor for a predetermined period of time, and to start that motor again after that predetermined period of time has expired. That's precisely what's in the claims of the 587 patent. The opposing counsel has said, well, there is this torque limit mode, and it's disclosed on page 3-15 of the Baldor reference, and that's appendix 579, that involves an evaluation of frequency. Now, that teaching should not trump other expressed teachings of overcurrent detection, which is expressed within the reference itself. And in fact, the torque limit mode is entirely optional. It is a mode of operation that can be overwritten by the operator of the system, and in fact, it does not in any shape or form state that in that mode there is a predicate evaluation of frequency before there's an evaluation of current, or that frequency is a proxy for current. In fact, Your Honors, I think it's quite the opposite. It states in that mode that there can still be an overcurrent detection and trip condition that occurs. But even putting aside the torque limit mode of operations, Your Honors, there are other expressed teachings, which the examiner agreed with us, of overcurrent detection and shutdown throughout this reference. And we've repeatedly, on the record, cited to the fault condition codes F-16 through F-19, which are on page 4-2 of the Baldor reference, and that can be found in appendix 592. Those are all identified by this manual as overcurrent detection. Wait, what are the... I see on page 592 these references to these fault codes, which means turning off the pump. Yes. And it says overcurrent during acceleration, overcurrent during deceleration, overcurrent while running. Why does the board say that these don't disclose an overcurrent situation? The only reason we can understand, Your Honors, is because they have improperly, we think, to the teachings of this torque limit mode, which is the only one that talks about frequency evaluation. And, Your Honors, I agree with you. I don't think that the board should have ruled that there's no detection of overcurrent when, in fact, the reference is overcurrent. What exactly did they say about these codes that are on 572? I believe, Your Honors, they, again, they acknowledge that there is a... No, no, no. Wait a minute. Show us what they said about it. I don't have the citation for that. You've got to come with it already prepared. You know, we've spent a lot of time looking at this stuff. You need to spend time looking at it. Understood. And, in fact, here's what they said with respect to the detection with Baldor. They said the request for emphatically states... Where are you? I'm looking at appendix 9, Your Honor. Request for emphatically states that nowhere does Baldor state... Wait, where? At the bottom footnote 3. Hold on a second. All right. Continue. Okay. It says here the requester emphatically states that nowhere does Baldor state that the overcurrent faults require frequency measurements, and they state that we find such a statement troubling because Baldor very clearly states that if the motor is loaded large enough to drive the inverter to below this output frequency, the inverter will trip on an overcurrent fault. Their conclusion there was that, accordingly, it's not the actual measurement of overcurrent that produces the fault, but the proxy measurement of frequency. But there's a disconnect there, Your Honors. There's a fundamental disconnect there because what they've quoted with respect to this discussion of frequency is only in this optional mode of torque limiting that is referred to on page 3-15 of the reference. It does not state that frequency is a proxy for the measurement of current anywhere in this reference at all. In fact, our expert... So what... Wait, wait. Hold on. Hold on. So what they're doing is saying that these fault codes... Yes. 16, 17, and 18, which refer to overcurrent... Yes, Your Honor. Are somehow cabined by the earlier discussion about torque limits? Correct, Your Honor. I think that's exactly what they've done and that was improper because in addition to what we're talking about, Your Honor, one of the other codes that are mentioned is bus current measurement. If you look at fault code F03, which is also on that page, it says bus current measurement. So precisely the type of current measurement to indicate there's a measurement fault, it requires that there be an evaluation of current, a measurement of current. So I think that, you know, there's expressed disclosure there that teaches overcurrent detection. The other thing I would like to point out, and I would like to just jump to the 112 grounds if I could, and then we'll come back to CARO. With respect to Balder, I'm still on, is, again, there's another ground of rejection that was adopted by the examiner, Your Honors, and it's Issue 23, Rejection 8, where we combine the teachings of the CARO reference, which again, CARO expressly teaches overcurrent detection and shutdown in combination. And that was acknowledged by the examiner in the right of appeal notice at Appendix 14039. But the board didn't address that combination? Correct, Your Honor. So we're really not in a position to rule on that, are we? I think you can rule whether or not a combination that the examiner found is obvious is something that could be decided here in this court, absolutely. It's entirely in the record in was a subject of the appeal as well. But the board's decision is what's before us, not the examiner's projection. Yes, Your Honor. Didn't the board find waiver with respect to this? I don't think they did with respect to any of these arguments, Your Honor. No, none whatsoever. I would like to turn to the 112 issues, if I could, Your Honors, because I am running out of time, and we will come back to CARO if we do have some extra time. The Section 112 issues, I'd like to just point you to Figure 1, if we could, of the patent, and that's Appendix 191. The issues are this. Claims 8 and 15 recite, powering the DC bus when the drive is shut down for the predetermined period of time. In other words, there's an application of power to the DC bus when the drives have been shut down. We stated to the examiner, and the examiner agreed with us, that there's no express disclosure anywhere in this reference, or even inherently, that supports that limitation. Those limitations were added during inter-parties re-examination by virtue of Pentair adding Claims 8 and 15. Additionally, there's an argument that was raised by Pentair, Your Honors, which talks about the LED of the terminal. If we look on Figure 1 of the patent, we see that what is identified in the specification as the DC bus is the element 48. It interconnects a current sensor, which is element 30, and the drive's 46. That is the only structure that is identified as a DC bus within this specification. In fact, it's a high-voltage DC bus. It says it's 390 volts, up to 390 volts. The board, we think, improperly concluded that by virtue of there being a teaching that there's an LEDA, which you see on Terminal 62, that somehow there must be a powered DC bus when the drives are shut down. But that's improper because the specification doesn't state that this DC bus 48, which is a high-voltage DC bus, actually powers this terminal and its LED62. Diagrammatically, it's not even shown connected to it whatsoever, nor is there any disclosure in the reference that that actually is powered by this DC bus. Your Honors, I would like to reserve whatever I have remaining for rebuttal. I think I do have two minutes at this point. Okay. Thank you, Your Honor. Thank you. Mr. Fahy again. Thank you, Your Honor. So with respect to Baldor, I don't understand where you have on 592 these fault codes that show tripping as a result of overcurrent, and the board says, oh, no, no, that's only, that's somehow limited by something that is said pages earlier in the reference on page 579. I mean, what's the basis for that? Because it's the only description of those fault codes, 16, 17, or 18. It's the only disclosure in Baldor. Well, the fault codes on their face are overcurrent fault codes. Well, they use the word overcurrent, but the description describes how they actually work, and that description as quoted and relied on by the board is talking about frequency. There is no disclosure. Where does paragraph 39 limit the fault codes to that situation? Well, this is what Hayward continues to try to do is to argue that a, you know, an absence of a disclosure is an affirmative disclosure. The question is, where is the disclosure? But it's hard to say. There's a tripping where there's an overcurrent situation, and you look at page 591. It talks about the codes. It says typical fault display. It shows F18. But it does not disclose affirmatively that the motor gets shut down for a period of time and then restarted because of an overcurrent fault. The only disclosure is frequency, and I will point out that this whole optional mode argument. We're not talking about restarting after a period of time here. We're just talking about whether it trips on an overcurrent situation. The claim language is restarting over a period of time. But I don't reference this, I guess, carol. It talks about what the period of time is. But here, what the board is saying is not that it doesn't restart in an appropriate period of time. It says that Baldor doesn't disclose tripping in an overcurrent situation. The only overcurrent situation. Isn't that correct? Isn't my statement correct? You're right, Your Honor. The board found that Baldor is missing, measuring current, comparing it to an upper limit, and shutting down the motor. It's an overcurrent trip. And when it describes fault codes that trip by overcurrent, that's not describing... It doesn't describe fault codes that trip by overcurrent. It describes those exact fault codes as tripping based on the output frequency. And when it talks about the current measurements... The fault code, the description of a fault code means it's tripping, right? Not necessarily. Not necessarily? It could have an LED indicator come on and let you know that the temperature is too high, or any number of things. That disclosure is absent from Baldor, and that's what the examiner found. And again, this was brought up again on the rehearing. And the examiner twice rejected this argument. And this whole new argument, and it is not properly before this court. The court can determine whether the board's finding of waiver of this argument... This on page 591, it says, these displays may occur from normal operation and from a fault trip condition. So contrary to what you're saying, this itself on its face says they're talking about a fault trip condition. But that can mean a number of things. A fault trip can mean notifying you that there's something going on. A fault trip can mean shutting down the motor. A fault trip can mean shutting down the motor and restarting the motor. A fault trip can mean resetting and not restarting. There is no affirmative disclosure in Baldor, as the board found, that you shut down the motor after an overcurrent fault. And in fact, the one fault code, fault code 20, where Baldor does disclose measuring current and comparing to an upper limit, it's doing the exact opposite. It's then allowing... It talks about, on the top page 592, it talks about passing the up arrow before the fault is reset. And that's resetting. Yes, Your Honor, it's resetting, it's not resetting. The fault codes have tripped the motor, right? In that situation, possibly. But there's no link, there's no affirmative disclosure linking that to an overcurrent fault. Well, that's on the same page. It's one of these fault situations. But when describing the fault codes, those exact fault codes, 16, 7, 18, the only description is measuring on frequency. Suppose you didn't have the page 579 in this reference. Forget about that, it didn't exist. Would you agree that page 592 shows fault codes tripping the motor in an overcurrent situation? Yes. Unfortunately, or fortunately, there is that disclosure. And that specific disclosure is, it could have said, when the current is over an upper limit, we trip, and that's fault 16, 17, and 18. Instead, the actual disclosure, not the absence of disclosure, but the actual disclosure says, look at fault 16, 17, and 18. It trips when the inverter is below the output frequency. There is no affirmative disclosure about tripping on an overcurrent fault. And that's what the board found. The board, again, had this issue come up to it twice, and once in the rehearing, and rejected the argument. What is the relationship between frequency and current that allows frequency to be a proxy for overcurrent? Well, the proxy language is from the board. The actual language in the disclosure is just talking about the inverter below this output frequency, and the inverter trips on the overcurrent fault. So there is no disclosure of that linkage. I mean, it sounds to me that there are two things going on here, that there's frequency that's an issue, and current that's an issue. And when the frequency drops below a certain level, then certain conditions present themselves where overcurrent can trigger a fault. Right, but if you're measuring current for other reasons, why wouldn't you have disclosed that in the reference? So that's a distinction that matters. And that's what the board relied upon. Right. So turning, Your Honors, to the Genhymer reference, which was mentioned by Hayward's counsel, claim construction is a non-issue. Regardless of the claim construction, Genhymer does not teach the claimed limitation. The switch in Genhymer, the starter in Genhymer, is not a drive under any definition, Hayward's or the board's claim construction. In regarding the 112 issues, Your Honor, raised by Hayward, if you look at the board's decision, the board adopts the examiner's findings, and then describes precisely its reasoning, and cites to the actual record where it says the written description support is. And that is a factual finding, and that is substantial evidence. And Hayward quibbles with what it wants the disclosure to mean, what it thinks the disclosure means, but nowhere does it say that this is not substantial evidence. The board made a factual finding, adopted the examiner's reasonings, then went on to explain further its reasoning, citing to the record that is the epitome of decision that should be upheld on substantial evidence. Finally, Your Honor, to the Baldor and Caro combination. There is zero evidence in the record that one of skill and the art at the time of the invention would have been motivated to combine Caro with Genhymer. And in fact- Could the board say that? Pardon? Did the board say that? No, the board didn't say that. What the board said is that Genhymer doesn't disclose all the limitations, and that Caro independently doesn't disclose the limitations. And that is, you know, the obviousness analysis should look at the claim as a whole. And if the limitations aren't in the references, then they don't even need to get to the issue. But another point, Your Honor, on Baldor and Caro is, again, that there's no rationale to combine, no evidence, no testimony from one of skill and the art in the rationale. And you're still missing elements. And that's what the board found, is that, you know, Baldor is missing the elements we were just talking about, and Caro is missing the same elements. So even in that combination, there are elements missing. So the board's findings there are enough for this panel to affirm. There are no other questions, Your Honor. Okay, thank you. Thank you, Mr. Payne. Mr. Nikolsky, you have two and a half minutes. So, Your Honors, just four quick points in response to what opposing counsel has said. I agree with Your Honors. I think that there is express disclosure of over-occurring detection, fault tripping, and shutdown and restart. Expressly within this reference, you look at Appendix 592 that Your Honor has been referring to. It says, in the event of a fault trip, the drive will shut down, and it will display a fault code. And, in fact, those codes are identified clearly as over-current fault codes. Secondarily, there's... Is there any expert testimony on this issue? Yes, Your Honor. In fact, our expert, Dr. Amati, which, unfortunately, the board didn't even address, specifically spoke to this point and said that he believes, in his review of it, as a person of ordinary skill and the art, that there is over-current detection. Absolutely. And is there expert testimony from the other side on this issue? Yes. And what did it say? It said it relied on the over-frequency argument. It said that this page 592 stuff was qualified by what happened earlier in the reference. Right. He doesn't say that reading this page on its own doesn't show over-current. Yes, Your Honor. That's correct. And, you know, there's also a disclosure, I think, of the automatic restart feature, which is clear within this reference. And, for those reasons, we think that it was improper for the board to reverse the Baldor grounds. I would like to very quickly talk about the new argument position that's been taken by opposing counsel with respect to torque limit. We don't think that that was a new argument. In fact, it was an argument that was raised by opposing counsel first on the appeal to the PTAB, that this torque limit mode is somehow optional. We reacted to that argument in our briefing to the board. Lastly, Your Honors, I would just like to point with respect to the 112 grounds of rejection. In fact, the examiner did agree with us that what was pointed to as this LED, and it's also referred to in the board's opinion, does not support, under 112 paragraph 1, the limitations that were put in Claims 8 and 15. And, in fact, that can be found in the decision by the RAN in Appendix 14-062, where the examiner specifically says, I don't see how an LED that's on a completely separate power supply could be powered by this DC bus. And we know that it's a high-voltage DC bus from the disclosure of the reference. Lastly, Your Honors, to react to what opposing counsel has said about the obviousness, rationales, and combinations of Baldor and Caro, those were presented to the examiner extensively. And, in fact, they were in our third-party comments, which addressed the combination of Baldor and Caro, that's in Appendix 12085 to 12086, and adopted by the RAN in Appendix 14039. Okay, thank you. Thank you, Your Honors. We're out of time. Thank both counsel. The case is submitted. That concludes our session. All rise.